**LAKE TRANSPORT, INC., Petitioner,**

**v.**

**RAILROAD COMMISSION OF TEXAS et al., Respondents.**

**No. B–4192.**

Supreme Court of Texas.

Feb. 20, 1974.

Rehearing Denied March 20, 1974.

Robinson, Felts, Starnes & Nations, Dan Felts, Mert Starnes and Phillip Robinson, Austin, for petitioner.

John L. Hill, Atty. Gen., Rex H. White, Jr., Asst. Atty. Gen., Austin, Phinney, Hallman & Pulley, Leroy Hallman, Dallas, McGinnis, Lochridge & Kilgore, Joe M. Kilgore and B. D. St. Clair, Austin, Vinson, Elkins, Searls & Smith, Dave McNeill, Jr., Houston, for respondents.

STEAKLEY, Justice.

The question here is whether Petitioner, Lake Transport, Inc., the holder of an inactive contract carrier permit, had standing to appeal an order of the Railroad Commission of Texas granting Coastal Transport Company, Inc., a certificate of public convenience and necessity as a specialized motor carrier. The courts below have held that it did not. We agree and affirm.

The circumstances posing the question are reviewed in detail in the opinion of the Court of Civil Appeals, 497 S.W.2d 329, and will be repeated only as necessary.

Lake's contract carrier permit was issued by the Railroad Commission in 1964; pursuant to the supporting contract, the permit authorized the transportation of plaster and gypsum products for United States Gypsum Company from its facilities at Galena Park, Texas, to Texas points within a 400 mile radius. United States Gypsum Company cancelled its contract with Lake, effective November 12, 1970, pursuant to the contractual provisions for termination; the right of such cancellation is not questioned. Indeed, Lake had the same contractual right of cancellation and cannot be required by the Commission to continue to serve its contracting shipper, or any other.

Since the contract cancellation, Lake has not rendered any motor carrier service and may not resume doing so except and unless the contract is renewed, or unless Lake enters into a contract with another shipper and its permit is amended to authorize service for such shipper.

The order of the Railroad Commission which Lake seeks to set aside by invoking the appeal provisions of Art. 911b,[1] later noted, authorized an amend-

---

1. Reference is to Vernon's Tex.Rev.Civ.Stat.Ann.

ment of the existing specialized motor carrier certificate of Coastal Transport Company, Inc., so as to authorize the transportation of gypsum products "from the plant site of United States Gypsum Company at Galena Park, Texas, to all points in Texas," subject to certain restrictions not here pertinent. A specialized motor carrier is a common carrier rendering a specialized service as authorized by Art. 911b, the Texas Motor Carrier Act. See, Alamo Express, Inc. v. Railroad Commission, 407 S.W.2d 479 (Tex.1966). As such, the carrier is under the common carrier obligation of serving the general public in the manner authorized by the certificate issued by the Commission.

■ Lake in this suit sought to invoke the appeal provisions of Sec. 20 of Art. 911b which provide, as pertinent here:

Sec. 20. *If any motor carrier or other party at interest* be dissatisfied with any decision, rate, charge, rule, order, act, or regulation adopted by the Commission, such dissatisfied person, association, corporation, or party after failing to get relief from the Commission may file a petition setting forth the particular objection to such decision, rate, charge, rule, order, act or regulations, or to either or all of them in the District Court in Travis County, Texas, against said Commission as defendant. . . . In all trials under this section the burden of proof shall rest upon plaintiff, *who must show by the preponderance of evidence that the* decisions, rates, regulations, rules, *orders*, classifications, acts, or charges *complained of are unreasonable and unjust to it or them.* . . . (Emphasis is added)

Rule 10 of the Rules of Practice and Procedure for the Transportation Division of the Railroad Commission states:

Any party in interest may appear in any proceeding before the Transportation Division. All appearances shall be subject to a motion to strike upon a showing that the party has no justiciable or administratively cognizable interest in the proceeding. As applied to proceedings under Article 911a and 911b of the Revised Civil Statutes of 1925 involving operating authority, a party in interest is any carrier operating over a route within that territory or serving any point proposed to be served by any applicant, and transporting any of the same class or classes of commodities or persons proposed to be transported by the applicant.

The current status of Lake Transport, Inc. was noted as follows in the report and recommended order of the examiner which was adopted and made a part of the order of the Commission granting the application of Coastal Transport Company, Inc.:

As the applicant points out in its brief, a contract carrier has no statutory obligation, apart from its contract, to provide service to a contracting shipper. Likewise, the Commission has no statutory authority to require a contract carrier to serve its supporting shipper or shippers. It follows that as a general proposition the Commission should not require a contracting shipper to utilize a particular contract carrier. The contract carrier permit issued to Lake only authorizes service under a continuing contract with USG. The Commission cannot dictate the terms of the contract between Lake and USG, or for that matter, force the parties to enter into a contract. There now exists no contract between the parties, and at least with respect to USG, no intention to again enter into a contract with Lake. It is therefore the Examiner's opinion that in the absence of such contract, Lake is not properly authorized to serve USG, and hence, is not an 'existing carrier' within the meaning of Article 911b.

The trial court sustained Coastal's plea in abatement to Lake's suit, on the ground that Lake had no justiciable interest and was without standing to seek judicial review of the order of the Railroad Commis-

sion granting Coastal's specialized motor carrier certificate. As noted, this action was affirmed by the intermediate court. It held that Lake was not a motor carrier at interest with any statutory or constitutional right to appear and protest Coastal's application, or to appeal under Section 20 of Art. 911b. Particular emphasis was given to the undisputed fact that Lake was neither operating over any route or serving any point, nor transporting any commodities as a contract carrier at any of the times material to the application of Coastal.

In Groendyke Transport, Inc. v. Railroad Commission, 426 S.W.2d 645 (Tex. Civ.App.1968, writ ref'd n. r. e.), this statement of the rule from 2 Am.Jur.2d, Administrative Law, Sec. 559, was quoted with approval:

> Where judicial review of administrative action is provided in the statute under which the administrative action is taken, the right of appeal to the courts is to be determined by looking at the statute, the valid regulations promulgated pursuant to it, and proven administrative practice throwing light upon their meaning.

It was also recognized in *Groendyke* that Rule 10 of the Commission (formerly Rule 30), has been in effect in substantially the same form since 1946 and has consistently been enforecd to disallow appearances by protesting specialized motor carriers who held no permanent certificated authority to perform any of the services proposed to be performed by an applicant.

Sec. 1(h) of Article 911b defines a "contract carrier" as a motor carrier transporting property for compensation or hire over any highway in this State "other than as a common carrier." Sec. 6(a) of Art. 911b says that a permit to operate as such shall not be issued unless the character of the proposed motor carrier operation strictly conforms with the definition of a contract carrier. Sec. 6–bb of Art. 911b not only prohibits the granting of a contract carrier permit to any person operating as a common carrier, but also prohibits the granting of a common carrier certificate to any person operating as a contract carrier. Under these statutory provisions the contract carrier is but a regulated private carrier who does not, may not, and cannot be required to serve the shipping public, or even to continue to serve a contracting shipper. It has been held that the state cannot constitutionally impose upon a private carrier the duties and obligations of a common carrier. Frost Trucking Co. v. R. R. Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L. Ed. 1101 (1926). And later, in Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288 (1932), the court spoke as follows concerning the contract carrier permit requirement of Art. 911b:

> On the contrary, the Texas statute in respect of permits deals exclusively with the private contract carrier, and requires the issue of the permit not to him in the imposed character of a common carrier, but in his actual character as a private contract carrier.

See, also Victory Truck Line v. Red Arrow Freight Lines, 186 S.W.2d 98 (Tex. Civ.App.1945, writ ref'd, w. o. m.).

The underlying concept of common carriage is that of a transportation service bound to respond to the needs of the shipping public without discrimination or difference between shippers. The Railroad Commission of Texas, the statutory agency charged with regulating motor carriers using the public highways, decides whether the public convenience and necessity requires a proposed common carrier service. In doing so, consideration must be given to the competitive effect upon presently operating carriers in the area and their continued ability to render effective public service. Railroad Commission v. Jackson, 157 Tex. 32, 299 S.W.2d 266 (1957). Accordingly, motor carriers performing an authorized existing service with which the proposed service will be competitive have the statutory right to appear and protest the

granting of a new service on the ground that their service, and that of other existing carriers, is adequate, and hence the proposed service is not required by the public convenience and necessity. A carrier in this position also has a statutory right of appeal to the courts from an adverse order of the Commission. Sec. 20 of Art. 911b, supra. This concept, that interested parties in a proceeding involving motor carrier operating rights are "carriers (that) operate over the routes and serve the points" in question, was recognized by this Court in Brown Express, Inc. v. Railroad Commission, 415 S.W.2d 394 (Tex. 1967), citing Railroad Commission of Texas v. Red Arrow Freight Lines, 96 S.W.2d 735 (Tex.Civ.App.1936, writ ref'd). Necessarily, the right of appeal provided by the statute presupposes that an appealing carrier is authorized to perform, and is performing, the character of service authorized by the Commission; thus the appealing carrier is in a position to show not only that the new service will impair its existing service by the loss of sustaining revenues, but also by reason of the availability of the existing services, there is not a public need for the newly authorized service.

It is manifest that the holder of an inactive contract carrier permit such as Lake cannot make this showing. It is of no significance in this respect that it is the policy of the Commission not to subject such a permit to cancellation. The salient fact is that Lake is not performing an existing service and may never do so again. Lake is not a common carrier and, as stated, is under no duty or responsibility as such. It cannot show any impairment of its service. To say that Lake has a statutory right of appeal under such circumstances would be

to say that it has the right to defeat a service which it is not rendering, and even to the limited extent of its permit, a service which it may possibly never render again; and this notwithstanding the common carrier service in question has been found by the Commission to be required by the public convenience and necessity. In our view, such an anomaly was not intended by the Legislature and is precluded by the requirement in Section 20 of Article 911b that an appealing party must be a party at interest and one in the position to show that the order under attack is unreasonable and unjust as to its existing service. *Cf.* our writing in Oil Field Haulers Ass'n. v. Railroad Commission, 381 S.W.2d 183, 195 (Tex.1964), with respect to the burden of an appealing party under the identically stated requirements of Art. 6453. And see City of Jefferson v. Railroad Commission, 453 S.W.2d 906 (Tex. Civ.App.1970, writ ref'd, n. r. e.).

The judgments below are affirmed.

Dissenting opinion by POPE, J., joined by WALKER and JOHNSON, JJ.

POPE, Justice (dissenting).

I respectfully dissent. Lake Transport, Inc., obtained its contract carrier permit in January, 1964, which authorized the transportation of commodities for United States Gypsum over the highways of this state. On June 22, 1970, Coastal Transport Co., Inc., filed an application with the Railroad Commission seeking a certificate as a specialized motor carrier to transport the same commodity for the same company in the same territory. In my opinion Lake is a "motor carrier or other party at interest" within the meaning of section 20, art. 911b, Vern.Tex.Civ.Stats. (1964),[1] and should

---

1. "If any motor carrier or other party at interest be dissatisfied with any decision, rate, charge, rule, order, act, or regulation adopted by the Commission, such dissatisfied person, association, corporation, or party after failing to get relief from the Commission may file a petition setting forth the particular objection to such decision, rate, charge, rule, order, act or regulations, or to either or all of them

in the District Court in Travis County, Texas, against said Commission as defendant........... In all trials under this section the burden of proof shall rest upon plaintiff, who must show by the preponderance of evidence that the decisions, rates, regulations, rules, orders, classifications, acts, or charges complained of are unreasonable and unjust to it or them."

not have been denied the right to appear and protest the new duplicating authority.

Lake commenced serving Gypsum under its contract in 1964 and was still doing so at the time Coastal filed its application on June 22, 1970. Lake, after notice of Coastal's application for the new authority, filed its protest and the Railroad Commission then set the hearing on the contested docket. The first setting was for August 31, 1970, but the hearing was postponed to November 4, 1970. The hearing was again postponed until December 8, 1970. There was and could be no question that Lake possessed standing to contest the new application during those early proceedings. The contract between Lake and Gypsum permitted either party to terminate the contract on thirty-day notice, and effective November 12, 1970, Gypsum did so terminate the contract with Lake. The majority now holds that Lake lost its standing when the contract ended.

Lake now owns a valid and subsisting permit according to the undisputed record before us. Its permit provides:

This permit to remain in effect from and after the date hereof, subject to the provisions of Chapter 277 Acts Regular Session of the Forty-second Legislature, 1931; the further orders of the Commission; and the rules and regulations of the Railroad Commission of Texas, heretofore prescribed or which may be hereafter prescribed under and pursuant to the authority conferred upon it by law.

As the holder of a contract carrier permit, Lake possesses rights which are not owned by the public generally. The permit may not be suspended, revoked or amended without prior notice to Lake and an opportunity for hearing, Sec. 12(b), art. 911b, and none of those procedures have been invoked against Lake. The permit may be sold, assigned, leased, transferred or inherited. Sec. 6(e), art. 911b. It is commonly known also that the holders of contract carrier permits frequently invest large sums of money in expensive equipment and

supportive facilities. In my opinion Lake owns something whether we term it a right, a privilege, a license, or "the new property." Schwartz, Crucial Areas in Administrative Law, 34 Geo.Wash.L. Rev. 401, 433–442 (1966); Reich, The New Property, 73 Yale ·L.J. 733 (1964). As Judge Burger wrote in Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570, 574 (1964), the terminology is not so significant as is the requirement of basic fair dealing by the government with those who are dependent upon it.

In my opinion the denial to Lake of its standing to protect its permit is unfair. Lake had a valid interest in protecting its permit and its permitted business from new competition. Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970); Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808 (1932); The Chicago Junction Case, 264 U.S. 258, 266–269, 44 S.Ct. 317, 68 L.Ed. 667 ,(1924); Associated Industries v. Ickes, 134 F.2d 694, 705 (2 Cir. 1943); 2 Am.Jur.2d, Administrative Law § 576 (1962). In 3 ·K. Davis, Administrative Law Treatise, (1958) § 22.11, at 259–260, the author reaches these conclusions:

In none of the Supreme Court decisions denying standing under the Interstate Commerce Act was the petitioner a carrier. Even a mere competitive interest of a carrier is sufficient for enforcing the Act or for challenging action of the Commission.

The public also has an interest in respecting the standing of competing carriers. FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L. Ed. 869 (1940). Justice Brandeis in Texas & Pac. Ry. v. Gulf, C. & S. F. Ry., 270 U. S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926), said, "competition between carriers may result in harm to the public as well as in benefit; and . . . when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss." This further pertinent extract from 3 K.

Davis, Administrative Law Treatise, § 22.-11 (1958), at 261, is helpful:

> Once this Brandeis analysis is accepted, other decisions recognizing the standing of carriers follow easily. Thus, Western Pac. C. R. Co. v. Southern Pac. Co., 284 U.S. 47 (1931), held that the Southern Pacific as a competitor had standing to enjoin the Western Pacific from constructing an extension before the ICC had granted approval. The Court said: "It will suffice, we think, if the bill discloses that some definite legal right possessed by complainant is seriously threatened or that the unauthorized and therefore unlawful action' of the defendant carrier may directly and adversely affect the complainant's welfare by bringing about some material change in the transportation situation."

The United States Supreme Court faced this question of the standing of a contract carrier in American Trucking Associations, Inc. v. United States, ICC., 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960). At issue was the application of the phrase "party in interest" as used in the Interstate Commerce Act. Sec. 305(g), 49 U.S.C.A. Certain existing contract carriers possessed permits to haul and had contracts to haul automobiles for General Motors in the Pacific Coast area. The existing carriers protested Pacific Motor Trucking Company's application to the Interstate Commerce Commission for authorization also to operate as a contract carrier to haul automobiles for General Motors over some of the territory already served by existing carriers. General Motors was the only shipper involved. American Trucking Associations, Inc. v. United States, 170 F.Supp. 38, 41–42 (D.D.C.1959). The district court had ruled that the existing carriers lacked standing to appeal from the Interstate Commerce Commission's order.

The Interstate Commerce Commission, in support of its order granting the new authority to haul for General Motors, found that General Motors, if the new permits were not authorized, would, nonetheless, refuse the continued services of the existing protesting carriers. This is the same situation upon which the majority relies for its no-contract-no-standing holding.[2] The United States Supreme Court rejected this reasoning and ruled that the competitor contract carriers had standing. The court wrote at 364 U.S., 17, 18, 80 S.Ct. at 1580:

> Although the three-judge court concluded that the Commission had not exceeded its authority in this case, two members of the court also believed that "there was no showing of actual or anticipated direct injury such as would entitle [the appellants] to institute this action." 170 F.Supp. at 48. In support of this conclusion, appellees rely principally upon Atchison, T. & S. F. R. Co. v. United States (D.C.Mo.) 130 F.Supp. 76, affd per curiam 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785. That decision held that certain railroads had no standing to challenge a Commission order authorizing acquisition by one motor carrier of others. Since the lower court in Atchison stressed the fact that the Commission there had not created any additional motor carrier service, the decision clearly is not in point. *In the instant case, not only has the Commission created new operating rights, but they are rights in which appellants have a stake. And surely the statement by General Motors that it would not in any event give the business to any appellant cannot deprive appellants of standing. The interests of these independents cannot be placed in the hands of a shipper to do with as it sees fit through predictions as to whom its business will or will not go.* The de-

---

2. The manager for Gypsum testified before the Railroad Commission, as found by the examiner, "that the outcome of the proceeding would have no effect on the future use of Lake Transport. As far as USG is concerned, the contract with Lake has been cancelled and the company would enter into private carriage in the event the application is denied."

cision we believe to be controlling is not Atchison, but rather Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586, where the Court confirmed the standing of a railroad to contest the award of a certificate to a competing trucker. We conclude, then, that appellants had standing to maintain their action to set aside the Commission's order under the "party in interest" criterion of § 205(g) of the Interstate Commerce Act, 49 Stat. 550, 49 U.S.C. § 305(g), . . . . [Emphasis added.]

In my opinion, Lake had the right to protest an application which could and did put it out of business, and it is my further opinion that recognition of Lake's right to protest would be in the public interest. I would reverse the judgment of the courts below.

WALKER and JOHNSON, JJ., join in this dissent.